## HUGH McCREARY v. LOUISE McCREARY ET AL.

*Resulting trust—Consideration paid by third party—Fraud.*

1. How. Stat. § 5569, which provides that when a grant for a valuable consideration shall be made to one person, and the consideration therefor shall be paid by another, no use or trust shall result in favor of the person making such payment, but the title shall vest in the grantee, "must be understood as applicable only to those cases in which the deed has assumed the form it has by consent of the party furnishing the consideration;" citing *Fisher v. Fobes,* 22 Mich. 457.

2. By a parol agreement between the owner of several parcels of land and his son and his four grandsons, the grandsons were to have the land upon the death of their father in agreed parcels, and a deed was to be executed to the father, to be delivered after the grandfather's death. It was expressly agreed that one of the grandsons should remain upon the home farm during the life of his grandfather, and until his father's death, when the farm should be his. A full warranty deed was executed by the grandfather to his son, and left in *escrow,* and upon his death, four years afterwards, was delivered to the grantee, who died six years after his father's death, during which ten years the grandson complied with the terms of his agreement, and his equities were recognized by his father until after his second marriage, which occurred during the tenth year; during all of which time the grandson supposed that his interest in the land was secured by the deed to his father. And it is held that the rights of the grandson do not rest alone in the parol agreement, but in such agreement, supplemented by an actual conveyance by the party who owned the

land when the agreement was made, executed in pursuance of such agreement, but in the form stated without the knowledge or consent of the grandson, and that the case is not within the prohibition of the statute.

Appeal from Ingham. (Person, J.) Argued February 17, 1892. Decided March 4, 1892.

Bill for specific performance of contract. Complainant appeals. Decree reversed, and one entered in accordance with the opinion. The facts are stated in the opinion.

*R. A. Montgomery* and *Cahill & Ostrander,* for complainant, contended:

1. Complainant's father held the land under a constructive trust for complainant; not an express trust, which must be evidenced by some writing, but a trust arising by reason of his fraud, the facts constituting which may be shown by parol; citing Perry, Tr. §§ 168, 226. This fraud, whether intended or not, was a legal fraud, and was accomplished by the father by inducing the grandfather, in the absence of complainant, to execute a - deed which contained no provisions for the son's benefit; and to prevent this fraud equity will raise a trust in the father, in favor of complainant, to secure to him what, but for the fraud, would have been clearly his by deed; citing Perry, Tr. § 168 *et seq.*

2. But if the provision for complainant's benefit was to rest in parol, and the grandfather and complainant relied upon the parol agreement of the father that at his death the land should go to complainant if he performed certain stipulated services for his grandfather and father during their lives, upon such performance would not equity say that for the father to accept performance and withhold compensation would be a fraud, by reason of which a trust would arise for complainant's benefit? citing *McMurtrie v. Bennette,* Har. Ch. 126; *Ingersoll v. Horton,* 7 Mich. 405; *Dickinson v. Wright,* 56 Id. 46; and if such a trust arose, even though not enforcible, the father had a right to recognize it; citing *Patton v. Chamberlain,* 44 Mich. 5; *Barber v. Milner,* 43 Id. 248; *Abbott v. Gregory,* 39 Id. 68.

3. If James McCreary and his heirs cannot be treated as trustees, then, under the facts, complainant became the purchaser of the land from both his grandfather and father, under a parol contract by which he was to pay for the same by working the

land and caring for them during their lives, which contract
became valid on its performance by complainant; citing *Scott
v. Bush*, 26 Mich. 419; *Davis v. Strowbridge*, 44 Id. 159.

*E. D. Lewis,* for defendants, contended:

1. The substance of the bill is that, if the complainant paid for
   the land by labor for his grandfather and father in a certain
   manner, he should have the land as compensation for such
   labor, which understanding was to have been reduced to writ-
   ing, but never was, and was not embodied in the deed there-
   after executed, and that complainant has performed his part
   of this verbal arrangement. Such a contract is void under
   the statute of frauds; citing How. Stat. §§ 6179, 6181, 6183,
   and notes; *Hillebrands v. Nibblelink*, 40 Mich. 646, 650; *Sutton
   v. Rowley*, 44 Id. 112; *DeMoss v. Robinson*, 46 Id. 62; *Dragoo
   v. Dragoo*, 50 Id. 573, 577; *Raub v. Smith*, 61 Id. 543; *Kelsey
   v. McDonald*, 76 Id. 188; *Cadman v. Markle*, Id. 448; *Ducett v.
   Wolf*, 81 Id. 311.

2. There are no allegations in the bill to take the case out of the
   statute, except that complainant has paid for the land in
   labor, according to the terms of a talk that was to have been
   reduced to writing; and this is not sufficient for that purpose;
   it can be estimated in damages; citing *Webster v. Gray*, 37
   Mich. 37, 39; *Lamb v. Hinman*, 46 Id. 112; *Peckham v. Balch*,
   49 Id. 179; *Crabill v. Marsh*, 38 Ohio St. 331; *Wallace v. Long*,
   105 Ind. 526.

3. A trust estate in lands cannot be created by parol, and in this
   instance there is no evidence of an intention to create any
   such estate; citing *Wright v. King*, Har. Ch. 12; *Newton v.
   Sly*, 15 Mich. 391; *Brown v. Bronson*, 35 Id. 415; *Cobb v. Cook*,
   49 Id. 11; *Shafter v. Huntington*, 53 Id. 310; *Pulford v. Mor-
   ton*, 62 Id. 25; *Everts v. Everts*, 80 Id. 222.

McGRATH, J. The bill filed asks that a certain 80
acres of land be decreed to belong to complainant.

In 1878 Hugh McCreary, the grandfather of complain-
ant, was the owner of the land in question, with several
other parcels, James McCreary, the father of complain-
ant, was the only son and child of said Hugh McCreary.
Complainant had three brothers, John, George, and James.
The grandfather had bought this 80 from the govern-
ment; had occupied it for many years. It was regarded
as the homestead, and, at the date last given, the grand-

father and James and his family were living upon it, and cultivating this and the other parcels. Hugh McCreary, Sr., on February 6, 1878, executed and deposited in escrow with John Grimes a warranty deed, running to James McCreary, of the 80 in question, with other land. Hugh McCreary died in 1882, and the deed was delivered by Grimes to James, and by the latter recorded March 12, 1883. James McCreary died in 1889.

Within a few days prior to the execution of this deed Hugh McCreary, the grandfather, James McCreary, the father, and the grandsons were specially convened, and the matter of the disposition of the grandfather's property was discussed.

George McCreary testifies relative to what occurred as follows:

"The conversation was at my grandfather's house at that time. They came down after me to come up there to talk the business over. I lived on this 160 acres of land, on section 35, at that time. For years previous to this, it had been talked in the family. We all lived together, father and mother, and grandfather and grandmother, before grandmother died, and it had been talked that a certain hundred acres of land was to be mine, the old homestead was to be Hugh's, and the 120 that father bought of Starkweather to be my brother John's, and a certain 160 was to be my youngest brother, Jim's. That had always been talked in the family for years and years, and it was to consummate this, and get it in shape, that I was asked to come up there that morning. Grandfather said that he and father had concluded to straighten up their business. He said there had been a little hard feeling between him and father, and he (father) wanted him to deed the property direct to him, and he didn't want to do it. He said that father's habits were not the soberest, and he was afraid he would squander it, and leave us boys without anything, and he proposed to make a deed of trust of all of his land similar to a life-lease; that he was to hold his property his life-time, and then that his land was to go to his boys, and each one of us.

90 MICH.—31.

boys was to pay a certain girl, take them in rotation, the oldest girl with the oldest boy, $500 a piece, and we were to have this land free and clear, and teams and tools to work it. Nothing said, as I know of, about buildings put on them. And they finally, he said, concluded to give the deed in that way. Father, he said— I don't remember particularly as he said anything."

John McCreary, referring to this occasion, says:

"Father and grandfather were going to have a settlement of their matters between them, and they were also consummating agreements with us boys. Father was an only child, so that, as a family, we were the only grandchildren of Hugh McCreary. Each boy was to have a certain parcel of land. Regarding this specific parcel of land in question, Hugh was told by father that the estate should go to him (father) as life-estate, conferring the property to Hugh at his death, upon consideration that he remain at home, and done by him as he had done by his father. Father was present, and he (grandfather) said,—called my father by his given name, and he says: 'James, I have concluded to settle up our business. I have got ready to, and the papers will be made out tomorrow;' and went on, and said that it was arranged that Hugh should have the old place, George should have a certain hundred acres of land,—it was the south part of the south-east quarter of section 34; and Jim, when he reached his majority, he was to have this quarter section; and my place was to be paid for and turned over to me, as I have said, with the team and buildings for my six years' labor.     *     *     *     Father said that it was to be given in deeds with his life-estate; the deeds running, the 80 acres in question here to Hugh, the 100 acres to George, and the 160 acres to Jim.     *     *     * We were fixing to settle up our matters. It was understood that we would talk them up, and come to an agreement that day. We were all there for that purpose. John Grims was to make the deeds.     *     *     *     What of the conversation took place in grandfather's presence was in the house, but we had talked the whole matter over previously with father at Fowlerville."

John Grimes says:

"The circumstances were these: James McCreary came

to my place, and stated that he and his father were likely to have trouble, and did have trouble, and that he was going to sue his father; that, as a mutual friend, he came to me to see what I advised, and I advised James that, inasmuch as his father was an old man, and on the brink of the grave, to get along, and not make any trouble about the matter at all. I said that perhaps his father would not live more than a month, probably not more than a year or two, at the most; and he went away from my place; and the next day James came back, and he says, 'You go up with me, and see father.' He says, 'We have got to have this settled; this suspense must be ended.' I went with him, and see there was considerable trouble in the family, and I refused to have more than one of the parties with me in the room at a time. I talked with the old gentleman first, learned what his wishes would be in the settlement of the matter, and then, after I had talked with him, he asked me to step out and have James come in. We were in the parlor. James came in. They both seemed to be quite determined in their ways.

"*Q.* What seemed to be the question of dispute between them?

"*A.* As I understood it, and did then, was that James McCreary wanted a full covenant warranty deed of the property. The old gentleman objected to that. He said he would not do it any way, and they came to a standstill, apparently, and I offered, as a compromise, that they settle it some way like this: That he make a deed to James, with the understanding that the instructions or the agreement between them should be carried out at James' death. The consideration was that Hugh McCreary, Jr., should have the homestead, as it appears it had been talked in the family. Hugh was to live on the farm,— take care of the farm. They were to live together as one family until he married, and then he (Hugh) was to give James such a share as would be just and equitable. That was the talk between them in my presence; that George, he was to have what is known as the 'Hundred-Acre Lot,'—it was the south part of the south-east quarter of section 34,—and that James, Jr., was to have the south half of the south-west quarter of section 34, and that John was to have the 120 acres where he lived, to be all paid up,—to be paid up by them jointly, as I understood it,—and a deed made to him for that property; and there

was something said about a 160 acres to James. The old James, Sr., owned the 80 acres right north. James was also to have that, and the boys in their order,—that is, John, with the next sister in age, was to pay her $500, and so on until the boys each paid $500; that James was to have this property, and the boys were to pay him, at least, a share of the crops that would be equitable between them during his life-time. That was the way I understood it at the time that the consideration of the deeds was drawn. That was a proposition I made to quiet, as I supposed, the trouble between them; that the old gentleman should remain absolute owner in a measure; that is to say, that the deeds should be made out and passed into the hands of a third party, and there to be kept by that third party during the life-time of the old gentleman, and that neither party should have access to the papers unless in the presence of each other, and at the request of both. I drew that little contract myself. I didn't at that time suppose that I would be the third party. I had no idea, in fact, and I rather not; but it appears that they had agreed upon me as the third party, and took the papers to me, and put them in my safe, and it remained there until after the old gentleman's death, and Mr. McCreary came and got the papers. After the death of Hugh, the title-deeds were delivered to James."

John says:

"A short time before father's death I had a talk with him about Hugh. I was endeavoring to get him to settle up his business, and he had become so miserable that he could not fulfill his agreement with any of us; but Hugh, in particular, he had agreed to do that. I said to my father that he had better put his property in shape; that it was being wasted, as matters were going. He said he would make the deed to Hugh as he agreed to, and he said he would let me know what day he would be ready, and I could be present, and he could fix his matters up, and get his business closed up. The arrangement was that we were to come here to Lansing to Mr. Montgomery's to transact that business. I met him at his place, and we went from there to Webberville for the purpose of coming here, and received a letter from Mr. Montgomery, saying that he had to go to Mason to defend a criminal case that day, and could not be here. So we did not

come that day. That was on Saturday, and the forepart of the next week father was taken sick."

George, referring to his father, says:

"He came to my house just the Friday night before he was taken sick, or the next Tuesday night, and wanted to know if I would come over to his place in the morning, and stay at the house while he and Hugh and John came up to Montgomery's to have some deeds made out; and I asked him what kind of deeds he was going to make out, and he said he was going to deed the homestead 80, across the road from where I live, to Hugh, and I asked him what he wanted me to come up there and stay for. Well, he said that Louisa had left him, and he didn't know but she would be back, and, if she came, not to let her in the house."

John Grimes says that he saw James McCreary shortly before his death, and James told him that he was going to make a deed to Hugh of the 80 right away; that Hugh was a good and worthy boy.

John Kirk says:

"I called down there to see about the insurance on the barn, and I said to Mr. McCreary, 'Why did you build that barn so far back from the road?' and he had set the barn back quite a ways; and, 'Well,' he says, 'I told the boy he could put the barn just where he wanted it.' He said it was going to be the boy's after he was through with it, so he let the boy put the barn just where he wanted it; and then he went on and said something in regard to how he had made a good cellar wall, because he said, he did not build it for himself,—he built it for the boy; and then he mentioned— He said for Hugh and for the boy,—he used them two terms."

George Gulick says that he had a conversation with James in his life-time, in which James said that his father owned the 80 in the first place, and—

"He said his father always said it should be his until he died, and then it fell to Hugh.    *    *    *    About a week before he died I saw him. I told him he was looking pretty bad. I says, 'James, I am afraid you won't live long;' and he said, 'I am feeling awful bad.'

'Well,' I says, 'you had better have this thing fixed up. Deed that place over to the boy while you are in your right mind, because I don't think you will live long.' I says, 'Go right along with me, and I will go with you now.' 'Well,' he says, 'too late in the day to do it; but,' he says, 'to-morrow I will come down to Williamston, and have the deeds made out, and my arrangements fixed up as I want them.' This is the last time I ever saw him. He told me this thing, that he was to have the land, many times. He used to tell me about all of the boys, and the first time he ever told me was about 12 or 13 years ago. He told it to George Beaman and myself."

George Dunckel refers to a conversation had with James McCreary 10 years ago, and says:

"James told me at that time that his father had given him a trust-deed for the premises, of the whole land that he owned, that the old gentleman owned, at that time,—a trust deed; that he was to hold it during his life-time, on that trust-deed, and then it should go to the boys, namely, John and George and Hugh and little James, and designated the pieces. He said this 80 was to go to Hugh. * * * He came to me later, four or five years later, and wanted to borrow some money of me, and I had heard that the old gentleman was getting involved. His note had always been good. We had always considered him perfectly good in that neighborhood, but I had heard, by the way, that he was getting somewhat involved; and I told him, says I, 'Mr. McCreary, I don't really like to let you have the money on your own note.' 'Well,' he says, 'how can I fix it?' 'Well,' I says, 'as I understand, Hugh is the owner of that property.' 'Yes,' he says, 'Hugh is the owner of that property.' 'Well,' I says, 'if that is the fact, I will take Hugh as indorser on the note.' 'Well,' he says, 'that is so.' Says he: 'Everything that is there belongs to Hugh, or will belong to him. He will make it perfectly good.' Well, I told him he might have the money, and, when he came after the money, Hugh came with him, and I wrote up the note, and they both signed it, and he got the money at the bank. I gave him an order to the bank, and he went there, and got the money."

A brother-in-law of complainant, called for the defense, says that at one time, in 1887 or 1888, the father, in a conversation with the witness, said "that Hugh thought that this deed was drawn up for him, but he said it was not, but he (Hugh) hadn't seen the deed." Naming another parcel of land, this witness refers to it as "the parcel that was to be George's," and says they (the family) supposed that his grandfather had provided that Hugh was to get this 80.

John went into possession of his 120 acres, and George went upon his parcel. Hugh, Jr., was 21 years in 1878. He continued to live upon the farm. He married in 1888, and built a house upon his 80, where he lived until after his father's death. He did not know that the deed to his father purported to convey the absolute title to the land until about a year before his father's death. Hugh's mother died about June 1, 1887. His father had been growing dissipated. After the death of his wife, James McCreary employed defendant Louise McCreary as his housekeeper. She testifies to a conversation had with him in the presence of Hugh, in which she told James that it was reported that Hugh had said that the 80 acres belonged to him; whereupon the father "got up, and went and brought the deed, and showed it to Hugh, and says he, 'There, by God, if you think you have got a deed to the place, here it is,' and he read it." This was the first intimation that Hugh had received that the deed to his father conveyed more than a life-estate to him. James was married to defendant Louise McCreary but about eight months, but during that period she had left him twice, the first time remaining away three days, and then her husband came after her, and the last time she was away one week, and James McCreary had filed a bill for divorce. Her first husband had obtained a divorce from her. She had obtained a divorce from her second

husband in December, 1887, and in February, 1888, she married James McCreary.

It is clear to us that the grandfather's intention was that the grandsons should take these lands upon the death of their father; that it was so arranged and agreed upon at the conference between the grandfather, the grandsons, and James, in 1878; that the deed from the grandfather to James was executed and delivered in view of the express agreement upon the part of James that the homestead should go to Hugh upon the death of James; that for 10 years complainant supposed that the papers had been made out in accordance with that understanding and agreement, and during all this time Hugh had been devoting himself to his father's interests, and to the farm, in accordance with both letter and spirit of that agreement; that the father had, from time to time, assured Hugh, as well as his neighbors and friends, that such was the understanding; that James, in his life-time, recognized Hugh's equities in the homestead, and intended until his excessive dissipation, and the financial troubles which grew out of that dissipation, as well as the alienation consequent upon his second marriage, had had their effect upon him, to carry out that understanding and agreement. The father's condition and environment account for his vacillation during the last year of his life. He was present at the making of the agreement with Hugh that if Hugh should remain upon the farm until his father's death the farm should be his. For four years thereafter, before the death of the grandfather, and before the deed came into the possession of the father, and for six years thereafter, Hugh complied with the terms of that agreement. It was agreed that a part of this consideration should go to James. The grandfather had so stipulated. The estate that should go to Hugh was clearly defined. Whether James insisted upon this

form of conveyance in order to secure the consideration which he was to receive does not appear. The property was not only conveyed and received with the agreement that it should be held for Hugh, but it was used and treated in accordance with that agreement. James received, during the six years that followed his father's death, the part of the consideration that it was provided should go to him. Complainant had performed. The grandfather, too, had executed the contract on his part, and, until the last year of his life, the father had in various ways recognized Hugh's equities.

Complainant's rights do not rest alone in a parol agreement, but in a parol agreement, supplemented by an actual conveyance of the estate claimed by the party who held the estate at the time of the contract, made in pursuance of the contract, but executed in the form made without the knowledge or consent of complainant. The question is not whether the original understanding or agreement can be enforced, but rather whether the estate of James McCreary shall be allowed to appropriate the entire avails. That contract must be regarded as so far executed. We are here dealing with the consideration which passed from the grandfather. There is no room for any presumption that any other or different arrangement existed between the grandfather and father, for here the proof is that the deed was executed in the furtherance of that contract. The grandfather had the right to provide that a part of the consideration should go to James, and, he having received that part and appropriated it, the case must be treated as though the entire consideration had passed at the time of the conveyance to James. The case made is not within the prohibition of the statute.

Section 5569, How. Stat., provides that,—

" When a grant for a valuable consideration shall be made to one person, and the consideration therefor shall be paid by another, no use or trust shall result in favor of the person by whom such payment shall be made, but the title shall vest in the person named as the alienee in such conveyance, subject only to the provisions of the next section."

But section 5571 provides that section 5569—

"Shall not extend to cases where the alienee named in the conveyance shall have taken the same as an absolute conveyance in his own name, without the knowledge or consent of the person paying the consideration, or when such alienee, in violation of some trust, shall have purchased the land so conveyed with moneys belonging to another person."

Justice COOLEY in *Fisher v. Fobes*, 22 Mich. 457, referring to section 5569, says:

" This provision, however, must be understood as applicable only to those cases in which the deed has assumed the form it has by consent of the party furnishing the consideration. It has no application to a case where one has taken a deed in his own name in fraud of the rights of another, nor to a case where, though no fraud was designed, the conveyance had been made to some person other than the purchaser without his consent. The purpose is to preclude parties from asserting equitable interests in land where they must rest upon parol evidence, in opposition to the written instruments of title which have been made with their consent and approval." *Groesbeck v. Seeley*, 13 Mich. 345; *Tyler v. Peatt*, 30 Id. 64; *Linsley v. Sinclair*, 24 Id. 380; *Ransom v. Ransom*, 31 Id. 301; *Hooker v. Oxford*, 33 Id. 452.

But it is insisted that Hugh took a lease of the premises, in 1888, from James for one year, and thereby abandoned his claim. Hugh was not entitled to absolute possession of the land. The estate of James had not then been determined. Again, this lease was executed in anticipation of Hugh's marriage, and, by the very terms of the original agreement, there was to be an adjustment

of shares or income from the farm upon the happening of that event. It was first proposed that the lease should be drawn up for five years, but, when the attorney who drew up the lease asked James if he wished the lease to run five years, he said: "No; one year will be enough. I shall call for you to make out a deed to Hugh of the farm."

It is next urged that the daughters have not been provided for as contemplated by the original agreement. During his life-time James McCreary executed a mortgage of $1,000 upon the homestead, which is a valid lien, and complainant must take subject to that lien. The daughters were made parties defendant in this proceeding, and the bill has been taken as confessed as against them. They alone have the right to complain.

The defendant Louise McCreary, prior to her marriage with James McCreary, had sufficient notice of complainant's claim to put her upon inquiry. She says that complainant claimed that he was going to sue James for a deed of the premises. Upon the death of James McCreary, she ceased to have any interest in the land in question.

Respecting the creditors of James McCreary, the claim of Hugh is quite as strong in equity as any claim of creditors can be.

The decree below is reversed, and a decree will be entered here for complainant in accordance with this opinion, with costs of both courts to complainant.

The other Justices concurred.